IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

LOVELY SKIN, INC.,              )
                               )
              Plaintiff,       )        8:10CV87
                               )
          v.                   )
                               )
ISHTAR SKIN CARE PRODUCTS,     )        MEMORANDUM OPINION
LLC.,                          )
                               )
              Defendant.       )
_____)

          This matter is before the Court following a bench trial
held July 18-23, 2012.  Plaintiff Lovely Skin, Inc. ("Lovely
Skin") brought this action against defendant Ishtar Skin Care
Products, LLC ("Ishtar") pursuant to:  15 U.S.C. § 1114(1),
trademark infringement; common law unfair competition; false
designation of origin under 15 U.S.C. § 1125(a); and injury to
business reputation in violation of Nebraska Revised Statute
§ 87-302(a)(1).  Ishtar filed a counterclaim against Lovely Skin,
calling for cancellation of the two Lovely Skin trademarks at
issue.  Upon review of the evidence presented at trial, the
parties' post-trial submissions, and the relevant law, the Court
makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

          **Lovely Skin**.  Lovely Skin is a Nebraska corporation
with its principal place of business in Omaha, Nebraska.  Lovely
Skin was incorporated on December 2, 2003.  Dr. Joel Schlessinger
and his wife, Mrs. Nancy Schlessinger, are the sole stockholders,

directors and officers of Lovely Skin.  Lovely Skin sells
cosmetic and skin care products and markets the same by means of
over-the-counter and internet sales.  Lovely Skin has sold and
marketed skin care products through its web site at the URL
"www.1ovelyskin.com" (the "Lovely Skin Site") since its
incorporation in 2003.

Beginning in 1999, Dr. Schlessinger's medical practice,
Skin Specialists, sold and marketed skin care products through
the Lovely Skin Site.  Skin Specialists first attempted to
register the marks LOVELYSKIN (STYLIZED) and LOVELYSKIN.COM
(STYLIZED) with the United States Patent and Trademark Office
(the "USPTO") in late 1999 - early 2000.  Before filing its
initial applications for registration in 1999, Skin Specialists'
trademark counsel, Mr. Keith Green, commissioned a trademark
search for marks similar to "Lovely Skin."  This search produced
23 different results, including a pending registration for the
mark LYS LOVE YOUR SKIN in the category of cosmetics and skin
care preparations, and a registration for the mark LOVE YOUR SKIN
in the category of facial creams and facial lotions (Trial
Exhibit 204).

Mr. Green testified that he was "concerned" about the
marks containing the phrase "LOVE YOUR SKIN" because the phrase
"contains the words 'love' and 'skin' which are obviously the
words that make up the mark LOVELYSKIN and LOVELYSKIN.COM and

-2-

[were] being used in connection with facial creams, facial lotions, et cetera" (Trial Transcript, 30:11-19). Mr. Green also acknowledged that these were some of the same product categories under which the Lovely Skin Marks were later registered (Trial Transcript, 61:18-62:1).

On July 7, 1999, Mr. Green faxed the trademark search results to Howard N. Kaplan, a Skin Specialists attorney working for the law firm of Brodkey, Cuddigan, Peebles and Belmont (Trial Exhibit 204; Trial Transcript, 24:12-25:10). On the cover sheet of the fax, as well as in handwritten notes within the trademark report, Mr. Green wrote, "Please note items 1 and 4 in particular" (Trial Exhibit 204; Trial Testimony, 25:11-14). Items 1 and 4 corresponded to the marks LYS LOVE YOUR SKIN and LOVE YOUR SKIN. Notes from Mr. Green's file showed that he and Mr. Kaplan discussed the trademark search results later that day (Trial Exhibit 489). Mr. Green's notes from the call stated, "Client does not care about search results, wants Fed application" (Trial Exhibit 489; Trial Transcript, 66:16-67:1).

The USPTO rejected the applications on November 8, 1999, and February 24, 2000. With regard to both terms, the USPTO stated, "**MARK IS MERELY DESCRIPTIVE** The examining attorney refuses registration on the Principal Register because the proposed mark merely describes the services" (Trial Exhibits 38, 35). Skin Specialists amended its applications to seek

-3-

registration of the marks LOVELYSKIN (stylized) and
LOVELYSKIN.COM (stylized) on the Supplemental Register.  The
registrations on the Supplemental Register have since been
cancelled (Trial Transcript 81:21-82:2).  On March 17, 2004, Skin
Specialists assigned all rights, title and interests to the marks
LOVELYSKIN (stylized) and LOVELYSKIN.COM (stylized) to Lovely
Skin.

        Since that time, Lovely Skin applied for and was
awarded registration of the two marks on the USPTO Principal
Register that are at issue in this action:  LOVELYSKIN
(stylized), Registration No. 2,998,098, dated September 20, 2005
(Trial Exhibit 42), and LOVELYSKIN.COM, Registration No.
3,253,791, dated June 19, 2007 (Trial Exhibit 46) (the "Lovely
Skin Marks").  On August 3, 2004, in its application for the
LOVELYSKIN mark, Lovely Skin stated that the mark had "become
distinctive of the goods/services through the applicant's
substantially exclusive and continuous use in commerce for at
least the five years immediately before the date of this
statement" (Trial Exhibit 201).  On January 16, 2007, in its
application for the LOVELYSKIN.COM mark, Lovely Skin stated, "The
mark has become distinctive of the goods and services as
evidenced by ownership of U.S. Registration 2998098 on the
Principal Register for the same mark [LOVELY SKIN] for related
goods and services" (Trial Exhibit 202).  Lovely Skin did not

-4-

submit any additional evidence to the USPTO regarding its claims of acquired distinctiveness or substantially exclusive and continuous use.  On June 8, 2005, the USPTO submitted a Notice of Publication "for the purpose of opposition by any person who believes he will be damaged by the registration of the mark" (Trial Exhibit 201, at 2).  No opposition to the registration of the mark LOVELYSKIN was recorded.  Similarly, no opposition to a 2007 Notice of Publication was noted for the mark LOVELYSKIN.COM.  The Lovely Skin Marks were ultimately registered under 15 U.S.C. § 1052(f).

In November 2010, Lovely Skin began operating a physical retail store in Omaha, Nebraska.  Lovely Skin uses the retail location to sell skin care products and spa services directly to consumers.  The retail location produced $229,737.35 in revenue during November and December 2010 and an additional $572,518.62 in revenue during the first half of 2011.  Lovely Skin, through its web site and retail location, offers numerous skin care products, including a product line under the brand name "Lovely Skin."  In addition to the sale and advertisement of skin care products, the Lovely Skin Site offers links to spa services, dermatology services and cosmetic surgery services offered through Skin Specialists.  The total revenue received by Lovely Skin was $7.1 million in 2009, $8.6 million in 2010, and $5 million through the first half of 2011.

-5-

The Lovely Skin Site currently offers approximately 250 product lines from 180 different vendors, including the "Lovely Skin" product line.  The top selling products on the Lovely Skin Site are Obagi, Kinerase, SkinMedica, Teamine by Revision, and Colorscience.

Until November 2010, Lovely Skin used a version of the logo reflected in Figure 1 below as its primary logo.  The logo displayed the name "LovelySkin.com" in blue or white, with a sunflower marking the period between "LovelySkin" and the "com" portions of the mark:



[Figure 1]

The logo included the words "For a more beautiful you, surf us!" below the stylized URL "LovelySkin.com."  This logo was included in the header on the front page of the Lovely Skin Site and was used frequently in Lovely Skin's advertising.

In November 2010, Lovely Skin began using the logo reflected in Figure 2 below as its primary logo.  The new logo displays the name "LovelySkin" in light blue, without the ".com" suffix, and with a three-petal flower design emanating from the "l" in "Skin":

-6-



[Figure 2]

Like the original logo, the new logo includes the words "For a more beautiful you, surf us!" below the stylized name "LovelySkin." This logo is currently included in the header on the Lovely Skin Site. A version of this logo, without the words "For a more beautiful you, surf us!" is used on the front of LovelySkin's retail location.

**Ishtar**. Ishtar is a California limited liability company with its principal place of business in Porter Ranch, California. In the past, Ishtar has had its principal place of business in Granada Hills, California. Ishtar's sole member and business manager is Ms. Sharokin Vardeh.

Ishtar is engaged in the business of selling skin care products over the internet. On November 14, 2005, Ms. Vardeh registered two domain names, www.livelyskin.com (the "Ishtar Site") and www.energeticskin.com, with GoDaddy.com. On November 28, 2005, Ms. Vardeh transferred the domain name www.livelyskin.com to Yahoo.com.

In order to get the Ishtar Site up and running, Ms. Vardeh purchased a package from the Yahoo Store that would provide Ishtar a web site template and also hosting services.

The template Ishtar received was predesigned and only required Ms. Vardeh to update it with Ishtar's information.  The Yahoo Store package also provided Ishtar with a secure shopping cart that would handle all customer purchases.

Ishtar began marketing and selling third-party skin care products through the Ishtar Site in December 2005 and has continued to do so since that time.  Ishtar does business under the name "LivelySkin.com."  Ishtar does not maintain, nor has it ever maintained, any physical retail location.  All, or substantially all, of Ishtar's uses of the term "livelyskin" on the Ishtar Site or elsewhere have been made in conjunction with the full name "LivelySkin.com" with the ".com" suffix attached.

Ishtar does not offer or advertise, nor has it ever offered or advertised, any spa services, dermatology services or cosmetic surgery services.  Ishtar's only revenue-producing activity is the sale of skin care products through the Ishtar Site.  Moreover, Ishtar does not have its own brand of products; its advertising and marketing methods are focused on the famous trademarks of product manufacturers, such as Teamine and Kinerase.

Since its inception in 2005, Ishtar has displayed the following text at the top of the front page of the Ishtar Site. The text displays the full name "LivelySkin.com" in black lettering:

# LivelySkin.com

[Figure 3]

Ishtar's total revenues for 2010 were $366,375.00.

**The Parties' Trademark Dispute**.  Lovely Skin first became aware of the use of the Ishtar Site on or about March 17, 2006.  Lovely Skin began bidding on "livelyskin" as a keyword through Google's AdWords program in September 2008.  In connection with the Google AdWords program, Lovely Skin used the term "livelyskin" under a broad match keyword, which generated 298 clicks out of 2,363 impressions.

In March 2008, Lovely Skin experienced an instance of what it claims to be actual confusion between Lovely Skin and Ishtar, concerning a March 4, 2008, email from Lovely Skin customer Lauri Solaimani to Cathy Hutfless, Director of Internet Sales for Lovely Skin (Trial Exhibit 205).  In the email, Ms. Solaimani asked for an update on the status of an order she had already placed through the Lovely Skin Site.  Lovely Skin claims this email demonstrates that Ms. Solaimani was confused because she incorrectly typed Ms. Hutfless's address as "Cathy@livelyskin.com" in the "cc" line of the email.  Apart from this single instance of alleged confusion, Lovely Skin submitted no other evidence of actual confusion at trial.

-9-

Lovely Skin did not make any demand upon Ishtar to discontinue its use of the Ishtar Site until May 15, 2009; Lovely Skin's counsel sent a letter addressed to "Ms. Sharon Vardeh, Ishtar Skincare Products, LLC, 17330 Chatsworth Street #11, Grenada Hills, CA 91344." The certified copy of that letter was returned to Lovely Skin's counsel unclaimed.

On March 3, 2010, Lovely Skin brought this action against Ishtar. On September 7, 2010, Ishtar filed a petition with the USPTO for cancellation of the Lovely Skin Marks (the "Cancellation Petition") (Trial Exhibit 472). The Cancellation Petition was filed within five years of the registrations of both Lovely Skin Marks. The USPTO has stayed the cancellation proceeding, pending the outcome of this litigation. On November 24, 2010, Ishtar filed its answer, where it asserted two counterclaims that request cancellation of the registration of the Lovely Skin Marks (Filing No. 41).

## CONCLUSIONS OF LAW

This Court has jurisdiction over Lovely Skin's claims and Ishtar's counterclaims brought under the Lanham Act pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338. Jurisdiction over Lovely Skin's state law claims is based on the supplemental jurisdiction of the Court under 28 U.S.C. § 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

**Ishtar's Counterclaim for Cancellation of the Lovely Skin Marks**.

In its counterclaims, Ishtar seeks cancellation of the registration of the Lovely Skin Marks.  Section 37 of the Lanham Act, describing the power of the court over registration, states, "In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."  15 U.S.C. § 1119.  Ishtar filed its Cancellation Petition with the USPTO on September 7, 2010, but the proceedings with the USPTO have been suspended pending resolution of this case.

**A.  Lovely Skins' Trademarks - Rebuttable Presumption of Acquired Distinctiveness**.  There are four categories of terms with respect to trademark protection.  "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful."  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir. 1976) (the "*Abercrombie* Spectrum").  Marks in the first two classes of the *Abercrombie* Spectrum are non-distinctive and are not capable of being registered.  Marks in the second two classes are distinctive and are capable of being registered.  Conversely, "[r]egistered marks . . . are

-11-

presumed to be distinctive . . . ." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994).

"The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). The acquisition of "secondary meaning" means that the mark "has become distinctive of the applicant's goods in commerce," established by "proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f). A mark registered under § 1052(f) "cannot be inherently distinctive as a matter of law." *Aromatique,* 28 F.3d at 869.

The fact that the Lovely Skin Marks are registered on the principal register is "prima facie evidence of the validity of the registered mark[s]." 15 U.S.C. § 1115(a); *see Aromatique*, 28 F.3d at 869. In particular, because Lovely Skin's marks are registered under 15 U.S.C. § 1052(f), the marks are presumed to have acquired distinctiveness, or secondary meaning, as of the date the marks are registered. *Aromatique*, 28 F.3d at 870.

Therefore, "the only issue is whether the petitioner [Ishtar] can rebut the presumption that the USPTO was correct in

accepting the evidence [submitted by Lovely Skin with its registration applications] as proof of acquired distinctiveness (secondary meaning)."  2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:34 (4th ed.).[1]  "The party seeking cancellation must prove two elements: (1) that it has standing; and (2) that there are valid grounds for cancelling the registration."  *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000).

　　　　**1.  Istar's Standing.**  A trademark registration petition for cancellation may be filed "by any person who believes that he is or will be damaged . . . by the registration of a mark on the principal register . . . [w]ithin five years from the date of the registration of the mark. . . ."  15 U.S.C. § 1064(1) (Lanham Act § 14).   Because the Cancellation Petition was filed within five years from the date of the registration of the Lovely Skin Marks, paragraph 1 of Lanham Act § 14 applies in this proceeding.

　　　　 "[A] petitioner asking for cancellation need not plead or prove actual damage." McCarthy, *supra*, § 20:46.  "If the owner of a registration has asserted it against the Petitioner, either alleging infringement or asserting it in an inter partes case, then petitioner is more than an intermeddler and has standing to

---

[1] Both parties cite the McCarthy treatise extensively as a leading authority on trademark law.

cancel that registration." McCarthy, *supra*, § 20:46 (citing *M.C.I. Foods, Inc. v. Brady Bunte, Brady Bunte v. M.C.I. Foods, Inc.*, 96 U.S.P.Q.2d 1544, 1546, 2010 WL 3798506 (Trademark Tr. & App. Bd. Sep. 13, 2010)).  Because Lovely Skin has brought an action specifically asserting its registrations against Ishtar, the Court finds that Ishtar has been or will be damaged by the Lovely Skin Marks in the context of 15 U.S.C. § 1064(1) and that Ishtar has standing to challenge the registration of the marks.

### 2. Valid Grounds for Cancellation of Registration.

### a. Evaluation of Acquired Distinctiveness - Timing.

"In a cancellation proceeding, which, of course, involves an issued registration, the question is whether an issue of distinctiveness must be determined as of the date of registration, or as of the time when the issue of distinctiveness is under consideration in the cancellation proceeding."  Harsco Corp. v. Elec. Sci., Inc., 9 U.S.P.Q.2d 1570, 1988 WL 252330, at *2 (Trademark Tr. & App. Bd. Aug. 17, 1988).  "We believe that the critical date is the date of registration, because if a mark which is not registrable in the absence of proof of distinctiveness was not in fact distinctive at the time of the issuance of a registration thereof, then the registration was invalidly issued."  Id.  "[E]ven if there is agreement that, at present, the registered mark possesses secondary meaning, the petitioner would nevertheless prevail if it is established that

-14-

as of the time of registration, the mark was merely descriptive and was devoid of secondary meaning." Neapco Inc. v. Dana Corp., 12 U.S.P.Q.2d 1746, 1989 WL 274388, at *1 (Trademark Tr. & App. Bd. Sept. 26, 1989). Accordingly, the Court will determine whether the Lovely Skin Marks had acquired secondary meaning as of September 20, 2005, for the mark LOVELYSKIN and as of June 19, 2007, for the mark LOVELYSKIN.COM.

      **b.  Burden of Proof.**  "As in cancellation proceedings in the Patent and Trademark Office, a litigant in court who prays for cancellation has the burden of overcoming the evidentiary effect [the presumption of distinctiveness] of a federal registration." McCarthy, *supra*, § 30:109. "To rebut this presumption, a party seeking to cancel a Section 2(f) registration must produce sufficient evidence for the Board to conclude, in view of the entire record in the cancellation proceeding, that the party has rebutted the mark's presumption of acquired distinctiveness by a preponderance of the evidence." *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009). The Court acknowledges that the parties disagree as to whether the burden of persuasion or the burden of production befalls the petitioner. Because the Court finds that Ishtar meets its burden under either standard, the Court declines to decide which burden must control.

-15-

    **c.  Valid Grounds for Cancellation.**  In order to prove
that valid grounds exist for cancelling the registrations, in the
case of marks that were registered for less than five years at
the time the petitioner requested cancellation, "any ground that
would have prevented registration in the first place qualifies as
a valid ground for cancellation."  *Cunningham*, 222 F.3d at 946.
Thus, Ishtar must show that Lovely Skin did not have "exclusive
and continuous use" of its marks for five years at the time of
its applications such that the marks had not acquired
distinctiveness through secondary meaning at that time.  15
U.S.C. § 1052(f).  Ishtar must thereby overcome the "record
evidence" submitted by Lovely Skin during prosecution as to the
marks' secondary meaning.  Cold War, 586 F.3d at 1358.

       The "record evidence" in this case is limited.  In its
application to the USPTO for the LOVELYSKIN mark, Lovely Skin
stated that the mark had acquired distinctiveness through
substantially exclusive and continuous use in commerce for at
least the five years immediately before the date of the
statement.  Similarly, in its application for the LOVELYSKIN.COM
mark, Lovely Skin relied on the LOVELYSKIN registration as
evidence of distinctiveness.  Lovely Skin did not submit any
additional evidence to the USPTO to support these statements.

       In its effort to rebut the presumption of validity, at
trial, Ishtar questioned trademark attorney Keith Green, who had

-16-

supervised the preparation of the applications for the
registration of the Lovely Skin Marks in 2004 and 2007.  In
response to Ishtar's questions, Mr. Green stated that he did not
personally perform any investigation at that time to determine
whether or not Lovely Skin's statement to the USPTO about
exclusive use was true, nor did he review any documentation or
information that would substantiate Lovely Skin's claim of
exclusive use.  Mr. Green was not aware of any such investigation
performed by his associate, Kristin Carnaby, who had worked on
the 2004 application.  Ms. Carnaby herself had no particular
recollection of the 2004 application.

Also in response to Ishtar's questioning, Mr. Green
stated that he conducted no investigation as to whether the LYS
LOVE YOUR SKIN and LOVE YOUR SKIN marks that had been identified
in 1999 were still in use in 2004, when Lovely Skin was claiming
exclusive use of the LOVELYSKIN mark.  Mr. Green did state that
he had been concerned that these marks "might be viewed by the
examining attorney as having similarity which might impede or
prevent the registration of our applications" (Trial Transcript,
61:4-6).  Ishtar also introduced Mr. Green's notes from his phone
call with Skin Specialists' attorney, stating, "Client does not
care about search results, wants Fed application."

Finally, in response to Ishtar's questioning on the
same topic, Dr. Schlessinger also testified, "I don't have any

-17-

evidence at this point to give to you regarding the exclusivity, no, not at this time" (Trial Transcript, 542:12-14).

On the other hand, Ishtar provided evidence that another registered mark named "LOVE YOUR SKIN"[2] has been in use since April 2004 by another Omaha dermatologist, starting some four months before the date of registration for LOVELYSKIN.  In addition, Ishtar presented evidence of a skin care business incorporated by a California aesthetician in 2003 under the name "Lovely Skin, Inc." (Trial Exhibit 15, at 1, 9) and a business operating in Clifton Heights, Pennsylvania, in 2003 under the name "Lovely Nails & Skin Care" (Trial Exhibit 18, at 234).  Thus Ishtar argues that at the time of the registration of the Lovely Skin Marks in September 2005 and June 2007, Lovely Skin did not enjoy exclusive use.

In consideration of the foregoing, the Court finds that Ishtar has satisfied its burden to rebut the presumption that the Lovely Skin Marks had acquired distinctiveness through five years of continuous and exclusive use as of the date of their registrations.

**B.  Secondary Meaning.**  Because Ishtar has established a "prima facie showing of invalidity," the "burden of producing

---

[2] There appears to be no relationship between this LOVE YOUR SKIN mark and the one discovered in the 1999 search, which was registered to a Georgia corporation.

-18-

additional evidence or argument in defense of registration" now shifts to Lovely Skin.  Cold War, 586 F.3d at 1358.

> In order to establish secondary meaning, the user of a mark . . . must show that by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others.

Aromatique, 28 F.3d at 870.  "Secondary meaning does not require the consumer to identify a source by name but does require that the public recognize the mark and associate it with a single source." *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005).

"[A]lthough direct evidence such as consumer testimony or surveys are most probative of secondary meaning, it can also be proven by circumstantial evidence." *Id.* "Although failure to undertake a consumer survey concerning recognition of the [plaintiffs'] mark is not by itself fatal to plaintiffs' assertion of secondary meaning, where the other evidence of consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily against plaintiffs' position."

*Brown v. Quiniou*, 744 F. Supp. 463, 470 (S.D.N.Y. 1990) (citation omitted).[3]

While Lovely Skin did not provide any "direct evidence such as consumer testimony or surveys" to substantiate its assertion of secondary meaning in the Lovely Skin Marks, Lovely Skin did retain Mr. James T. Berger to conduct a "distinctiveness study" on the mark LOVELY SKIN. Mr. Berger's survey was aimed exclusively at the issue of inherent distinctiveness as a result of the establishment of suggestiveness, and he testified at trial that his survey did not involve a study of secondary meaning (Trial Transcript at 245:11-17, 246:17-25).

Despite the fact that Lovely Skin freely admits that its marks are descriptive, not suggestive, and despite the fact that this Court has found as a matter of law that the Lovely Skin Marks are descriptive, not suggestive, Mr. Berger was undeterred in offering his opinion that LOVELYSKIN is "a suggestive trademark" (Trial Transcript, at 266:13-15), and thereby (inherently) distinctive. Mr. Berger himself testified that he was not aware of any proof of secondary meaning in this case (Trial Transcript, 298:21-23). The Court finds that Mr. Berger's

---

[3] The Court notes Lovely Skin's concern about the inherent problem in commissioning a survey taken in the present to establish secondary meaning at some time in the past. *See Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006) ("A court may easily take into consideration the strength of recognition at the time of the survey in light of the amount of time passed between that date and the date of infringement.").

study does not support any argument by Lovely Skin that its mark LOVELYSKIN has acquired secondary meaning.

Lovely Skin also presented circumstantial evidence by Megan Driscoll, Lovely Skin's retained public relations consultant. Ms. Driscoll's professional relationship with Lovely Skin began in 2010, and she was first made aware of Lovely Skin in 2008. Ms. Driscoll testified that she does due diligence on prospective clients, usually going about five or six years back, but she did not state whether or not she had done any such due diligence on Lovely Skin, and she did not give any opinion as to Lovely Skin that predated 2010. Thus, her testimony cannot directly support Lovely Skin's argument that its marks had secondary meaning at the time of the dates of their registration.

Nevertheless, assuming, *arguendo*, that evidence of secondary meaning after the dates of registration of the Lovely Skin Marks could shed some light on the secondary meaning that the marks enjoyed in the past, the Court will address Ms. Driscoll's testimony and proffered evidence.[4]  The Court must first note that Ms. Driscoll is not an independent expert. Ms. Driscoll's employer, Behrman Communications, earns $20,000.00 per month in fees, plus up to $1,500.00 per month in expenses, from

---

[4] *See Gen. Motors*, 468 F.3d at 419 ("In light of the strong statistical evidence (96% recognition in 1999 and 77% recognition in 2002), we hold that General Motors's survey evidence was sufficient to support secondary meaning [in 1992 and 1997].").

Lovely Skin.   The Court views Ms. Driscoll's testimony with those facts in mind.

Lovely Skin states that the result of hiring Ms. Driscoll and her public relations firm has been an increase in the Lovely Skin Marks "being seen in articles relating to the subject of beauty in [national] publications" (Filing No. 171, at ¶ 92).  Ms. Driscoll testified as to the number of "impressions," that is, the number of people who "likely read" a magazine containing the Lovely Skin Marks (Trial Transcript, 448:10-14). Yet in response to questioning by the Court at trial, Ms. Driscoll agreed that she had "no idea" how many people have actually seen any of the articles in which the Lovely Skin Marks have appeared (Trial Transcript, 486:7-9).  Ms. Driscoll volunteered, "Well, and that's where some of the consumer behavior studies that companies do that I work with, that's where that comes in handy . . . ."  (Trial Transcript, 487:11-16). When the Court then asked, "But none of that is calculated into these numbers you've given?"  Ms Driscoll replied, "No, it's not."  (Trial Transcript, 487:18-20).

The Court finds that by her own admission, Ms. Driscoll's proffered evidence of "impressions" of people viewing magazine articles or advertisements involving the Lovely Skin Marks offers little in the way of evidence that any consumer has actually seen or read the articles or advertisements.

-22-

Finally, Lovely Skin produced its own circumstantial evidence that it claimed favored a finding of secondary meaning. "Circumstantial evidence such as the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying could also establish secondary meaning." *Frosty Treats*, 426 F.3d at 1005-06. "Although it is true that advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the *effect* of such advertising that is important, not its extent." *Co-Rect Products, Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985). "To be effective in this respect, the advertising must cause the public to equate the mark with the source of the product." *Id.* Similarly, "Because the proper inquiry is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product, sales figures alone are inadequate to establish a connection between a product and its source." *Aromatique*, 28 F.3d at 873 (citation omitted).

In support of the finding of secondary meaning as of the dates of registration of the Lovely Skin Marks, September 2005 and June 2007, Lovely Skin cites the following facts. First, Lovely Skin has used the Lovely Skin Marks, LOVELYSKIN (stylized) and LOVELYSKIN.COM, "in connection with sales and

-23-

marketing of good[s] and services in the skin care products industry since at least 1999" (Filing No. 171, ¶ 85).  Lovely Skin has used various methods of advertising, promoting, and marketing its marks.  Lovely Skin purchases keywords on search engines and uses email advertising to make consumers aware of its marks.  Total revenue increased from approximately $300,000 in 2002 to $2.9 million in 2004, $5.1 million in 2005, and nearly $12.7 million in 2011.  Lovely Skin claims that there is "a correlation between the use of search engine marketing and the purchase of keywords and sales" (Filing No. 171, at ¶ 90).  In addition, "As of 2012, Lovely Skin is the fourth largest internet retailer of cosmetics and skin care products" and "the 534th largest internet retailer in the world" (Filing No. 171, at ¶¶ 101, 102).

     While it is clear that Lovely Skin's sales have increased during the time in question, these asserted facts do not establish that "the public recognize[s] the mark[s] and associate[s them] with a single source." *Frosty Treats*, 426 F.3d at 1005.  Lovely Skin did not provide any evidence that the increased sales were the result of, or that the advertising sales produced, a recognition in the public of the Lovely Skin Marks.  Lovely Skin's increasing revenues could attest to the recognition by the public of the marks of the products it sells just as easily as the recognition by the public of the Lovely Skin Marks.

-24-

In addition, a large percentage of Lovely Skin's keyword advertising is aimed at brand names of Lovely Skin's products, not the words "Lovely Skin."  While Lovely Skin currently purchases approximately 10,000 different keywords, only a tiny fraction of its advertising budget is spend on keywords based on variations of the term "Lovely Skin" (See Trial Exhibits 220, 221).  Keyword purchases during the years 2003-2005 did not include purchases for the keyword "Lovely Skin" at all.  It follows that many of Lovely Skin's customers may well search for the brand name of a particular product without ever noticing the mark of the seller, Lovely Skin.

Likewise, keywords containing some variation of "Lovely Skin" accounted for a small percentage of clicks on the Lovely Skin Site that were generated by Lovely Skin's keyword purchases. Ishtar points out, "Dr. Schlessinger even agreed that there were not as many people that click on 'lovely skin' as compared to 'obagi,' the name of a third-party product sold by Lovely Skin" (Filing No. 172 at 21).  Ishtar reasons, "This indicates that consumers were arriving at the Lovely Skin Site not because of Lovely Skin's name recognition, but because of the popularity of the third-party products" (Id.).

**Likelihood of Confusion**.

"Secondary meaning is an issue of validity and likelihood of confusion is an issue of infringement.  Although

-25-

two separate legal issues, they will sometimes overlap."
McCarthy, *supra*, § 15:11.  Actual confusion, or, according to
some courts, the likelihood of confusion, can be an indicium of
secondary meaning.  *See* McCarthy, *supra*, § 15:11 ("If there is
some customer confusion in fact, then it follows logically that
there must also be some secondary meaning in the senior user's
designation."; *Surgicenters of Am., Inc. v. Med. Dental
Surgeries, Co.*, 601 F.2d 1011, 1018-19 (9th Cir. 1979) ("The
district court properly recognized that one of the indicia of
secondary meaning is the likelihood of confusion among buyers.").

    The Eighth Circuit recited the requirements for the
likelihood of confusion in what have become known as the
"*SquirtCo* factors:"

> To determine the likelihood of
> confusion between the trademarks
> and the allegedly infringing marks,
> we consider the following factors
> set forth in *SquirtCo. v. Seven-Up
> Co.*:  1) the strength of the
> trademark owner's mark; 2) the
> similarity between the trademark
> owner's mark and the alleged
> infringing mark; 3) the degree to
> which the allegedly infringing
> services competes with the
> trademark owner's services; 4) the
> alleged infringer's intent to
> confuse the public; 5) the degree
> of care reasonably expected of
> potential customers; and 6)
> evidence of actual confusion.

*Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch
of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011)

(citing *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)).  "Likelihood of confusion is a finding of fact." *SquirtCo.*, 628 F.2d at 1091. "[R]esolution of this issue does not hinge on a single factor but requires a consideration of numerous factors to determine whether under all the circumstances there is a likelihood of confusion."  *Id.*

"Failure of a trademark owner to run a survey to support its claims of brand significance and/or likelihood of confusion, where it has the financial means of doing so, may give rise to the inference that the contents of the survey would be unfavorable, and may result in the court denying relief."  *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985).  Lovely Skin did not perform a likelihood of confusion survey.

### 1.  The Strength of the Trademark Owner's Mark.

**Conceptual Strength.**  Both of the Lovely Skin Marks were originally declared "merely descriptive" by the USPTO.  In addition, both marks were subsequently registered under 15 U.S.C. § 1052(f), which amounts to an admission that the marks are descriptive.  Nevertheless, Lovely Skin argues that "through the findings in the Berger Report regarding a survey conducted by James T. Berger, Lovely Skin's marks are much nearer the suggestive area of the spectrum of marks, affording it broader

-27-

protection than a highly descriptive trademark" (Filing No. 170, at 18).

After hearing the testimony of Mr. Berger at trial, the Court finds that he made it abundantly clear that his survey was designed to prove one thing only, which is that the Lovely Skin Marks are suggestive.  The Court recognizes that the categorization of trademarks has been described, as above, as a "spectrum."  But this does not mean that a party's § 2(f) registration has no meaning with regard to distinctiveness.  Unlike Lovely Skin, the Court cannot extrapolate from Mr. Berger's legally incorrect conclusion to create factual support for the likelihood of confusion, which would have required another survey altogether.  The Court again finds that the Lovely Skin Marks are descriptive from the point of view of the Lanham Act and, if they had acquired secondary meaning, would be in the weakest possible conceptual category of a protectable mark.[5]

**Commercial Strength.**  "In the likelihood of confusion context, a mark's commercial strength or 'fame' is determined based on the 'public recognition and renown' of the mark as evidenced by the extent of advertising, sales volume, features and reviews in publications, and survey evidence."  *Roederer v.*

---

[5] Because the Court finds that Mr. Berger's survey is irrelevant to any issue in the case, the Court does not address Ishtar's many objections to the methodology used to conduct the survey.

*J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 866-67 (D. Minn. 2010) (quoting *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1374 (Fed. Cir. 2005)). "For purposes of the likelihood of confusion analysis, the relevant market for evaluating commercial strength or fame is 'the class of customers and potential customers of a product or service, and not the general public.'" *Roederer*, 732 F. Supp. 2d at 867 (quoting *Palm Bay*, 396 F.3d at 1375). The analysis of commercial strength is made "as of the time the mark is asserted in litigation" *Id.* (quotation omitted).

　　　　As with its argument in favor of secondary meaning, Lovely Skin points to its increasing advertising expenditures, keyword purchases, and sales as evidence of commercial strength. But as with the secondary meaning analysis, the same problem presents itself -- it is impossible to determine whether these facts are indicative of the "public recognition and renown" of the Lovely Skin Marks as opposed to the marks of the products sold by Lovely Skin.

　　　　Lovely Skin states, "It is not inconceivable for this Court to infer that a vast majority of women who subscribe or purchase magazines dedicated to beauty and fashion are likely to read the articles featuring products offered on the Lovely Skin's web site" (Filing No. 174, at 2-3). Even assuming this to be

-29-

true, the Court still has no way of determining whether such a
magazine reader makes any mental note of the Lovely Skin Marks.
While Ms. Driscoll, Lovely Skin's public relations consultant,
not surprisingly opines that the Lovely Skin Marks are well
known, she did not perform any kind of investigation as to
whether the purchasing public shares her view.  As a factual
matter, the Court finds that Lovely Skin has not established that
the Lovely Skin Marks themselves enjoy a high degree of
commercial strength in the marketplace.

     **2.  The Similarity Between the Trademark Owner's Mark
and the Alleged Infringing Mark.**  "[E]ven a 'weak' mark is
entitled to protection against subsequent registration or use by
another for a closely similar format on closely competitive goods
or services."  *ConAgra, Inc. v. George A. Hormel & Co.*, 784 F.
Supp. 700, 707 (D. Neb. 1992) *aff'd sub nom. ConAgra, Inc. v.
George A. Hormel & Co.*, 990 F.2d 368 (8th Cir. 1993).  "Thus,
whether a mark is 'weak' or not is of little importance if the
junior mark is identical and the goods are closely related."  *Id.*
In this way, the similarity factor takes on additional
significance in this case.

     "In evaluating the similarity of the marks, a court
considers the overall impression created by the marks, including
their trade dress and visual, aural, and definitional attributes,
to determine whether 'the total effect conveyed by the two marks

is confusingly similar.'"   *Roederer*, 732 F. Supp. 2d at 869

(quoting *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830

(8th Cir. 1999).

   The Court agrees with Lovely Skin that the terms

"LovelySkin.com" and "LivelySkin.com" are obviously very similar

in appearance, down to the lack of a space and the capitalization

of the "S" in the middle of the name.  The marks do differ in

their stylizations (*see* Figures 1, 2, and 3 above), but the Court

finds that these differences are not as significant as the

similarities of the words themselves.  The Court notes Lovely

Skin's observation, "As is the case for Ishtar, many of the

consuming public arrives at Lovely Skin's web site through an

internet search engine, where embellishments of trademarks are

not visible" (Filing No. 174, at 3).  In addition, while the

vowels "o" and "I" have different sounds, the terms sound the

same in every other respect.  Finally, although Lovely Skin and

Skin Specialists engage in other business endeavors, both parties

principally use their marks to promote the sale of high-end

cosmetics in the internet marketplace.

   The definitions of the words "lovely" and "lively" are,

of course, different.  In addition, in his deposition, Dr.

Schlessinger stated that the two terms create very different

images:  "And the association with the word Lively Skin was

concerning for me because Lively Skin conjured up images of

things crawling on you and bugs, whereas Lovely Skin was exactly
the opposite" (Trial Transcript, 572:17-20).  In summary, while
the parties' marks are surely similar, they are not "identical,"
which might otherwise afford a weak mark more protection.
*ConAgra*, 784 F. Supp. at 707.

    **3.  The Degree to Which the Allegedly Infringing
Services Competes With the Trademark Owner's Services.**  "Where
products are wholly unrelated, this factor weighs against a
finding that confusion is likely.  Where products are related,
however, it is reasonable for consumers to think that the
products come from the same source, and confusion, therefore, is
more likely."  *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049,
1056 (8th Cir. 2005).  Ishtar claims that there is little
competition between the parties because Dr. Schlessinger has a
physical store, spa, and medical practice, while Ms. Vardeh does
not.  Meanwhile, Lovely Skin emphasizes the importance of
internet sales to Lovely Skin's overall business plan.  Although
Dr. Schlessinger and Lovely Skin do offer some services that
Ishtar does not, the Court finds that the two businesses overlap
in the high-end cosmetics sales industry, both selling many of
the same product lines, principally on the internet.

    **4.  The Alleged Infringer's Intent to Confuse the
Public.**  "While proof of bad intent is not required for success
in an infringement or unfair competition claim, the absence of

-32-

such intent is a factor to be considered." *Sensient Technologies Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010) *cert. denied*, 131 S. Ct. 1603, 179 L. Ed. 2d 500 (U.S. 2011) (quotation omitted).

Lovely Skin has provided little evidence as to any intent to infringe by Ishtar.  At trial, Ms. Vardeh testified that Ishtar did not have knowledge of Lovely Skin's name or website when it adopted the URL www.livelyskin.com.  If anything, the evidence suggests that Ms. Vardeh was interested in the concept of "lively skin" as opposed to trying to mimic the words "lovely skin," since she registered both the domain names "livelyskin.com" and "energeticskin.com" during the same transaction.  Ms. Vardeh testified that she settled on livelyskin.com because "[m]ost of these anti-aging product or overall skin care product rejuvenate the skin, they bring the skin back alive" (Trial Transcript, 647:4-6).

Lovely Skin argues,

> In light of Sharokin Vardeh's admissions that she has always had a great interest in skin care products and online shopping ability, and Lovely Skin's efforts of drawing online shoppers to its web site through advertising on search engines by purchasing keywords of the exact names of skin care products, it is unlikely that Sharokin Vardeh was unaware of the marks LOVELYSKIN (stylized) and LOVELYSKIN.COM.

(Filing No. 170, at 30).  Yet Lovely Skin provides no evidence to
support this statement.  The Court finds that no credible
evidence has been introduced to suggest that Ishtar intentionally
infringed on the Lovely Skin Marks.

    **5.  The Degree of Care Reasonably Expected of Potential
Customers**.  "The likelihood of confusion determination also takes
into account the degree of care exercised by the purchasers,
which requires consideration of the type of product, its cost,
and conditions of purchase." *Roederer*, 732 F. Supp. 2d at 877
(citing *SquirtCo*, 628 F.2d at 1091).  "The Court must 'stand in
the shoes of the ordinary purchaser, buying under the normally
prevalent conditions of the market and giving the attention such
purchasers usually give in buying that class of goods.'" *Id.*
(quoting *Luigino's*, 170 F.3d at 832).

    In this case, Ms. Driscoll, acknowledged that the
products offered by Lovely Skin were "high end," "prestige"
products, based on their medical-grade ingredients, price point,
and efficacy (Trial Transcript 489:24-490:9).  These
"cosmeceuticals," offered by both Lovely Skin and Ishtar, are
often sold for particular purposes, such as acne care, wrinkle
treatment, skin pigmentation, and eyelash growth (Trial Exhibit
463).  Lovely Skin sells certain eye creams for up to $185.00.

    Lovely Skin argues, "Regardless of the price of the
products offered and the conditions of purchase, the identical

-34-

characteristics of Lovely Skin's and Ishtar's marks and products offered, the sophistication of the relevant purchasing public cannot be relied on to prevent confusion" (Filing No. 170, at 34-35). The Court disagrees and finds that both parties operate in a niche market where their customers would be expected to take greater care in making their sometimes substantial purchases, thereby reducing the likelihood of confusion.

      **6. Evidence of Actual Confusion.** "[W]hen determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." *Frosty Treats*, 426 F.3d at 1009 (quotation omitted). At trial, Dr. Schlessinger testified, "Somewhere around 2009 that came to a crescendo and, yes, we were seeing quite a bit of instances both orally and a couple written instances of confusion between the two [marks]" (Trial Transcript, 185:25-186:3). In particular, Dr. Schlessinger testified that a customer intended to send an email to cathy@lovelyskin.com but mistakenly sent the email to cathy@livelyskin.com, possibly because the "l" is next to the "o" on the keyboard (Trial Exhibit 205). Upon examination of the exhibit, the Court finds that the customer clearly knew that she was contacting Lovely Skin, but she simply made a typographical error in entering the address. On the other hand, Ms. Vardeh testified that she had not observed a single instance of confusion from her end.

Acknowledging the scarcity of evidence of actual confusion, Lovely Skin emphasizes the fact that if a customer intended to go to the Lovely Skin Site, but out of confusion went to the Ishtar Site instead, that customer might just order a product from Ishtar, and Lovely Skin would have no way of knowing about it.  Ishtar counters that Lovely Skin could have gotten around any difficulty in establishing confusion by commissioning a confusion study.

In summary, the Court must agree with Ishtar's contention that "[i]f a likelihood of confusion did exist, [one] would expect to see a much higher level of actual confusion given the parties' six years of coexistence" (Filing No. 172, at 33). It is indisputable that similarities exist between the parties' marks and that the parties engage in competing sales of high-end cosmetics over the internet.  Nevertheless, evaluating the six *SquirtCo* factors as a whole, and taking into account the evidence presented at trial, the Court does not find a likelihood of confusion exists between the parties' marks.

In consideration of the absence of direct evidence in support of secondary meaning, insufficient circumstantial evidence, and insufficient evidence of lack of confusion among the buying public, the Court finds that Lovely Skin has not sustained its burden to prove that the Lovely Skin Marks have "become so associated in the public mind with such goods that the

-36-

mark[s] serve[] to identify the source of the goods and to
distinguish them from those of others" as of the dates of the
registration of the marks.  Aromatique, 28 F.3d at 870.
Consequently, the Court finds that the Lovely Skin Marks had not
acquired secondary meaning as of the dates of their registration.
Because the Lovely Skin Marks had not acquired distinctiveness by
the dates of their registration, their registration under 15
U.S.C. § 1052(f) shall be cancelled.

**Count I of Lovely Skin's Complaint:  Trademark Infringement**.

        "Any person who shall, without the consent of the
registrant -- use in commerce any reproduction, counterfeit,
copy, or colorable imitation of a registered mark in connection
with the sale, . . . of any goods . . . or in connection with
which such use is likely to cause confusion . . . shall be liable
in a civil action by the registrant for the remedies hereinafter
provided."  15 U.S.C. § 1114(1)(a).  Because the Court finds
judgment in favor of Ishtar with regard to its counterclaim for
cancellation of the registration of the Lovely Skin Marks, the
Court also finds for Ishtar on the count of infringement of a
registered trademark pursuant to 15 U.S.C. § 1114(1)(a).

**Count II of Lovely Skin's Complaint:  Common Law Unfair
Competition**.

        Count II of Lovely Skin's complaint alleges common law
unfair competition.  "Trademark infringement is a part of the
broader law of unfair competition, and the facts supporting a

-37-

suit for infringement and one for unfair competition are substantially identical." *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 483 (8th Cir. 1967).  Lovely Skin states, "Establishing claims of trademark infringement and unfair competition under the Lanham Act or common law requires that Lovely Skin prove ownership of valid and distinctive trademarks entitled to protection, and that Ishtar's use of a similar mark is likely to cause confusion as to the source of defendant's product or service" (Filing No. 170, at 14) (citing *Roederer*, 732 F. Supp. 2d at 863); *see Sensient*, 613 F.3d at 763 n.3.  Because Lovely Skin has not established that it owns distinctive, protectable trademarks under the common law, and because the Court has found that no likelihood of confusion exists between the parties' marks, the Court finds for Ishtar on the count of common law unfair competition.

**Count III of Lovely Skin's Complaint:  False Designation of Origin Under 15 U.S.C. § 1125(a)**.

"Any person who, on or in connection with any goods . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, . . . which -- is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C.A. § 1125(a).  "To succeed on a claim of

-38-

false designation of origin with respect to an unregistered descriptive mark, before a likelihood of confusion or actual confusion is established, the user must show that the mark has acquired a secondary meaning."  Co-Rect Products, 780 F.2d at 1330.  "The user must also show that secondary meaning existed prior to the date on which the defendant commenced using the same or similar mark."  Id.

In this case, Ishtar began using the mark "www.livelyskin.com" in November 2005.  As discussed above, the Lovely Skin Marks had not acquired a secondary meaning as of November 2005.  In addition, the Court has found that no likelihood of confusion exists between the parties' marks. Therefore, the Court finds for Ishtar on the count of false designation of origin.

**Count IV of Lovely Skin's Complaint:  Injury to Business Reputation / Deceptive Trade Practice in Violation of Neb. Rev. Stat. § 87-302(a).**

The Nebraska Deceptive Trade Practices Act ("NDTPA") states, "A person engages in a deceptive trade practice when, in the course of his or her business, . . . he or she [p]asses off goods or services as those of another."  Neb. Rev. Stat. § 87-302.  To establish a violation of the NDTPA, Lovely Skin must prove that Ishtar has engaged in a deceptive trade practice and that Lovely Skin has been damaged, and the parties agree that this requires a likelihood of confusion among the purchasing

-39-

public as to the parties' respective marks (*See* Filing No. 170, at 14, Filing No. 172, at 59).  Because the Court has found that no likelihood of confusion exists between the parties' marks, the Court finds for Ishtar on the count of deceptive trade practice.

**Exceptional Case**.

Ishtar maintains that this is an "exceptional case" within the meaning of 15 U.S.C. § 1117(a), justifying the award of attorney fees and costs.  The parties have not specifically addressed the issue of attorney fees.  The Court declines to decide this issue without appropriate motion and briefing by the parties.  Costs will be assessed against the plaintiff.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 3rd day of October, 2012.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court